IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAYNE DIXON,                      :      CRIMINAL ACTION
                                   :      No. 12-620
          Petitioner,              :
                                   :      CIVIL ACTION
     v.                            :      No. 14-5647
                                   :
UNITED STATES OF AMERICA,          :
                                   :
          Respondent.              :


M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          December 30, 2015

**Table of Contents**

I.    INTRODUCTION...........................................2

II.   BACKGROUND.............................................2

III.  LEGAL STANDARD........................................7

IV.   DISCUSSION ...........................................10

      A.   Counsel's Personal Issues ......................11

      B.   Presentence Report Meeting......................15

      C.   Review of Presentence Report....................17

      D.   Safety Valve Reduction..........................19

      E.   Revised Plea Agreement..........................29

      F.   Relevant Conduct Issues.........................31

      G.   Advice Not to File Direct Appeal................34

V.    CERTIFICATE OF APPEALABILITY..........................35

VI.   CONCLUSION............................................35

## I.    INTRODUCTION

Petitioner Shayne Dixon is a federal prisoner incarcerated at Federal Correctional Institution Schuylkill in Minersville, Pennsylvania. Dixon filed a pro se motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his sentence, claiming that he received ineffective assistance of counsel, thereby rendering his plea agreement involuntary and unknowing. For the reasons that follow, the Court will deny the § 2255 motion without an evidentiary hearing.

## II.   BACKGROUND

On November 8, 2012, Shayne Dixon ("Dixon") was charged by indictment with five counts of distribution of marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D), and one count of possession of 100 kilograms or more of marijuana with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B). The facts of the case against Dixon were recited by the Government during the change of plea hearing on March 27, 2013. Change of Plea Hr'g Tr., Mar. 27, 2013, ECF No. 36 (filed under seal).[1] They are as follows:

---

[1]    This transcript was initially filed under seal but may be cited where relevant to Dixon's § 2255 claims, which specifically refer to events that occurred during and in relation to the change of plea hearing. See, e.g., United States v. Eleazer, No. 12-408-02, 2014 WL 1281137 (E.D. Pa. Mar. 28, 2014) (quoting DEA interviews filed under seal to assess a petitioner's § 2255 claim). Only those portions of the

After receiving information from a confidential source, special agents and task force officers of the Drug Enforcement Administration ("DEA") conducted surveillance of 4416 Hurley Street, Philadelphia, Pennsylvania ("the Hurley Street location") from February 14, 2012, to April 30, 2012. Id. at 18:22-19:1. At one point during the surveillance, DEA agents observed Dixon unloading boxes at the Hurley Street location, and just a few hours later, the agents observed a man taking six boxes out of the house. Id. at 22:7-11.

At approximately 5:40 PM on April 30, 2012, the agents saw Dixon leave the Hurley Street location and enter a Mercedes-Benz, which subsequently drove away. Id. at 19:7-11. When the agents stopped the car, Agent Neamiah Hagler approached the car and smelled an emanating odor. Id. at 19:12-14. Agent Hagler then searched the driver and recovered a small bag of marijuana. Id. at 19:15-16. Dixon was removed from the vehicle, detained, and read his Miranda rights. Id. at 19:17-18. Dixon waived his Miranda rights, told the agents that he sold marijuana, and stated that he had marijuana at the Hurley Street location. Id. at 19:19-21.

Dixon then consented to a search of the Hurley Street location. Id. at 19:22-25. During the search, the agents found

transcript necessary for an assessment of Dixon's claims are referenced.

3

over 800 pounds of marijuana, over $14,000 in cash, a loaded gun, ammunition, two digital scales, a bag sealer used for sealing marijuana packages or currency, and other paraphernalia used in drug trafficking operations. Id. at 20:1-6. Most of the marijuana was found in nineteen large, brown boxes, with each box containing approximately forty pounds of marijuana in a cellophane-sealed bag or bale. Id. at 20:7-12. Either the letter "A" or "B" was written on each box. Id. at 20:14-15. Dixon told the agents that the letter indicated the marijuana's quality, with "A" indicating a higher grade than "B." Id. at 20:16-18. The agents also determined that writing on the cellophane packaging indicated the weight of each package. Id. at 20:19-23.

During the search, the agents also found marijuana that was not boxed. Id. at 20:24-25. Dixon told the agents that the unboxed marijuana was "bad." Id. at 21:3-5. In total, 374 kilograms of marijuana were recovered. Id. at 21:6-9.

Dixon was not taken into custody on the day of the search. Id. at 21:15-16. He agreed to cooperate and returned the next day for a full interview by the agents. Id. at 21:16-19. During the interview, he told the agents that he had been selling 200 to 300 pounds of marijuana per month for the past three to four years. Id. at 21:19-21. He also stated that the day before the agents' search, he had left the Hurley Street location with $640,000 in bags that he carried to meet his

4

source for the marijuana. Id. at 21:22-25. Dixon identified his source as two Mexican men who, in exchange for the $640,000, gave him twenty-five large boxes of marijuana in a white van. Id. at 22:1-5. These twenty-five boxes were the boxes that the DEA agents had previously seen Dixon unloading at the Hurley Street location. Id. at 22:6-11.

Dixon also admitted that his sources had provided marijuana to him on other occasions. Id. at 22:12-14. He explained that his sources had previously provided him with cellular phones for communication, but communication was initiated only one way: they would contact him. Id. at 22:14-17. Dixon stated he always had to wait for them to arrive. Id. at 22:17-19.

In describing his own sales, Dixon stated that his customers would go to the Hurley Street location, where he would distribute marijuana to them. Id. at 22:24-23:1. After reviewing the agents' surveillance footage, Dixon confirmed that five distributions had occurred during their watch--distributions for which he was charged in Counts 1 through 5. Id. at 23:1-6; see also id. at 23:7-25:17 (explaining the five distributions in detail).

Following the Government's initial recitation of this factual summary, defense counsel, Mr. A. Charles Peruto, Jr., objected to the reference to Dixon's admissions about his prior

5

drug dealings. Id. at 26:14-38:9. The Government thereafter agreed to eliminate the reference to Dixon's admissions from the factual summary. Id. at 38:13-21. The Government also agreed to revise the fact section in the change of plea memorandum accordingly, id., and filed a revised version with the Court after the hearing, ECF No. 28.

Dixon pled guilty to Counts 1 through 6 pursuant to the non-cooperation plea agreement. Id. at 44:12-16. The Court sentenced Dixon on September 12, 2013, to 120 months in custody, followed by five years' supervised release. Sentencing Hr'g Tr. 85:1-8, Sept. 12, 2013, ECF No. 46. On September 12, 2013, the Court issued a judgment and preliminary order of forfeiture of the property at 2342-52 North 15th Street, Philadelphia, Pennsylvania, see J. & Prelim. Order of Forfeiture, ECF No. 45, pursuant to the consent motion filed by the Government, see Consent Mot. J. & Prel. Order of Forfeiture, ECF No. 44.[2]

On October 2, 2014, Dixon filed a timely[3] pro se motion under 28 U.S.C. § 2255 to vacate, set aside, or correct his

_____

[2]     The property was addressed during Defendant's sentencing where DEA Agent Haigler testified that during the Government's investigation of Defendant, they became aware of several properties that Defendant owned, including the property at 2342-52 North 15th Street. See Sentencing Hr'g Tr. 39:5-40:9. Agent Haigler indicated that the property had been transferred from Dixon to Erin Graham, Dixon's wife. See id. at 39:25-40:4.

[3]     The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") imposes a one-year statute of limitations for the

sentence. Mot. 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct

Sentence, ECF No. 60 [hereinafter "Def.'s Mot."]. Dixon then

filed a memorandum of law in support of his motion on January 2,

2015. ECF No. 65. On January 30, 2015, the government filed a

sealed response. ECF No. 66. The motion is now ripe for

disposition.

## III. LEGAL STANDARD

A federal prisoner "claiming the right to be

release . . . may move the court which imposed the sentence to

vacate, set aside or correct the sentence." 28 U.S.C. § 2255.

Such a prisoner may attack his sentence on any of the following

grounds: (1) the sentence was imposed in violation of the

---

filing of a habeas petition under 28 U.S.C. § 2255. Here, the statute of limitations began to run when Dixon's conviction was final. 28 U.S.C. § 2255(f)(1). In the instant case, the Court entered final judgment against Dixon on September 12, 2013. ECF No. 43. Because Dixon did not pursue a direct appeal, his conviction was final on the date on which the time for filing such an appeal expired. Kapral v. United States, 166 F.3d 565, 577 (3d Cir. 1999). Under Federal Rule of Appellate Procedure 4(b)(1)(A)(i), Dixon had fourteen days after final judgment to file a notice of appeal. Therefore, Dixon's conviction became final on September 26, 2013. Because Dixon is proceeding pro se, his motion is deemed to be filed on the date he gave the motion to prison officials for them to mail. See Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998). Although the docket indicates that Dixon's motion was filed on October 2, 2014, Dixon signed his motion on September 10, 2014, ECF No. 60 at 13, and it was delivered to the Court on September 12, 2014, id. at 16-17, within the one-year statute of limitations period. See United States v. Miles, No. 03-0417, 2007 WL 218755, *5 (E.D. Pa. Jan. 26, 2007). Therefore, Dixon's motion was timely filed.

Constitution or laws of the United States; (2) the court was
without jurisdiction to impose the sentence; or (3) the sentence
was in excess of the maximum authorized by law. Id. An
evidentiary hearing on the merits of a prisoner's claims is
necessary unless the motion, files, and records of the case
conclusively show that he is not entitled to relief. Id.
§ 2255(b). The court is to construe a prisoner's pro se pleading
liberally, Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per
curiam), but "vague and conclusory allegations contained in a
§ 2255 petition may be disposed of without further
investigation," United States v. Thomas, 221 F.3d 430, 437 (3d
Cir. 2000).

A § 2255 motion can be based upon a violation of the
Sixth Amendment right to effective assistance of counsel. See
Strickland v. Washington, 466 U.S. 668, 686, 697 (1984). By
claiming ineffective assistance, a defendant attacks "the
fundamental fairness of the proceeding." Id. at 697. Therefore,
as "fundamental fairness is the central concern of the writ of
habeas corpus," "[t]he principles governing ineffectiveness
should apply in federal collateral proceedings as they do on
direct appeal or in motions for a new trial." Id. Those
principles require a convicted defendant to establish both that
(1) his counsel's performance was deficient, and (2) the

deficient performance prejudiced his defense. Id. at 687;
Holland v. Horn, 519 F.3d 107, 120 (3d Cir. 2008).

To prove deficient performance, a defendant must show
that his "counsel's representation fell below an objective
standard of reasonableness." Holland, 519 F.3d at 120 (citing
Strickland, 466 U.S. at 688, 693). The court's "scrutiny of
counsel's performance must be highly deferential." Douglas v.
Cathel, 456 F.3d 403, 420 (3d Cir. 2006) (citing Strickland, 466
U.S. at 689). Accordingly, there is a "strong presumption that
counsel's conduct falls within the wide range of reasonable
professional assistance." Grant v. Lockett, 709 F.3d 224, 234
(3d Cir. 2013) (quoting Strickland, 466 U.S. at 689). In raising
an ineffective assistance claim, the defendant must first
identify the acts or omissions alleged not to be the result of
"reasonable professional judgment." Strickland, 466 U.S. at 690.
Next, the court must determine whether those acts or omissions
fall outside of the "wide range of professionally competent
assistance." Id.

To prove prejudice, a convicted defendant must
affirmatively prove that the alleged attorney errors "actually
had an adverse effect on the defense." Id. at 693. "The
defendant must show that there is a reasonable probability that,
but for counsel's unprofessional errors, the result of the
proceeding would have been different. A reasonable probability

9

is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Where a defendant argues that he received ineffective assistance during the plea process, the court must determine the validity of the guilty plea by asking whether it "represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25, 31 (1970). A plea's voluntariness when entered upon the advice of counsel "depends on whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." Hill v. Lockhart, 474 U.S. 52, 56 (1985). As with other ineffective assistance claims, if it is determined that counsel's advice was incompetent, the defendant must then prove prejudice. Id. at 58.

## IV. DISCUSSION

In his § 2255 motion, Dixon claims several grounds for relief. Each alleged basis for relief sounds in ineffective assistance of counsel and will be addressed in turn.[4] For the

---

[4] Dixon's first ground for review in his Motion is based on counsel's alleged failure to "properly advise [Dixon] of the potential sentence that he was exposed to." Def.'s Mot. 3. Although Dixon states in his motion that he "will further clarify and amplify this claim in a Memorandum of Law," id. 3-4, he does not specifically address this ground in his supporting memorandum. See generally Def.'s Mem. of Law in Support of Mot. Under 28 U.S.C. § 2255, ECF No. 65. Similarly, the Government's response does not separately address this basis. However, given

reasons that follow, the Court finds no need for an evidentiary hearing and concludes that Dixon is not entitled to relief.

### A.  Counsel's Personal Issues

Dixon first claims that Mr. Peruto "may have provided ineffective assistance during representation" as a result of his girlfriend's death. Def.'s Mot. 10. Dixon states that following the death of Mr. Peruto's girlfriend on May 25, 2013, until Dixon's sentencing, Mr. Peruto's "behavior was changed" and "it was clear that [he] was under a great deal of stress, would often appear confused, and was depressed." Def.'s Mem. Law in Support of Mot. 28 U.S.C. § 2255 at ¶ 18, ECF No. 65 [hereinafter "Def.'s Mem."]. Dixon further states that the Court never asked if Dixon "felt comfortable" with Mr. Peruto's representation in light of Mr. Peruto's personal issues. Id. at ¶ 7. Dixon also avers that he "cannot recall if the Court ever inquired directly to [Mr. Peruto] as to any concern regarding the mental state of [Mr. Peruto] and his ability to represent [Dixon] in an effective manner." Id.

As the Government points out, Dixon fails to show any prejudice suffered as a result of Mr. Peruto's allegedly poor mental state. Gov't's Resp. 10, ECF No. 66. If a defendant fails

---

the connection between this ground and grounds pertaining to his safety valve reduction and relevant conduct issues, it will be considered alongside those issues.

to demonstrate that he suffered prejudice as a result of counsel's alleged deficiencies, the Court need not determine whether counsel's performance was constitutionally deficient. Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").

Although the death of Mr. Peruto's girlfriend was surely a traumatic event under the circumstances, Dixon does not identify any specific prejudice as a result of Mr. Peruto's allegedly poor mental state. The Government correctly states that there is no evidence in the sentencing hearing transcript or otherwise that Mr. Peruto was "not mentally capable to represent the petitioner," and instead, "counsel's representation was excellent and included a vigorous attack on the government's relevant conduct evidence, and an impressive allocution as to the appropriate sentence." Gov't's Resp. 10-11.

Moreover, there is no blanket presumption of prejudice based on counsel's supposed mental condition "unless the condition manifests itself in courtroom behavior." Smith v. Ylst, 826 F.2d 872, 875 (9th Cir. 1987). As the Ninth Circuit has explained, "a defendant must point to specific errors or omissions which prejudiced his defense, because if a mental illness or defect indeed has some impact on the attorney's

12

professional judgment it should be manifested in his courtroom behavior." Id. The Fifth Circuit has taken a similar approach in assessing a defendant's claim that counsel was too old and too ill during the trial to provide effective assistance. Buckelew v. United States, 575 F.2d 515, 520-21 (5th Cir. 1978). The Fifth Circuit rejected the defendants' ineffective counsel claim because they made no specific allegation of prejudice resulting from counsel's supposed illness. Id. at 521. Here, because Dixon has not made any specific allegation of prejudice or pointed to any specific errors or omissions in Mr. Peruto's performance, he has not shown that the alleged ineffectiveness "actually had an adverse effect on the defense." Strickland, 466 U.S. at 693.

Dixon's additional argument that the Court failed to ask if Dixon "felt comfortable" with Mr. Peruto's continued representation also cannot provide a basis for relief. Where a defendant requests substitute counsel on the eve of trial or raises concerns about counsel's representation, the court has the "duty to inquire into the basis for the client's objection to counsel." McMahon v. Fulcomer, 821 F.2d 934, 942 (3d Cir. 1987) (quoting Brown v. United States, 264 F.2d 363, 369 (D.C. Cir. 1959) (en banc) (Burger, J., concurring in part)). Likewise, if a defendant decides to waive counsel and proceed pro se, the court has a duty to ensure the defendant understands the full implications of his decision. Virgin Islands v.

13

<u>Charles</u>, 72 F.3d 401, 404 (3d Cir. 1995). But even under those specific circumstances where the court has an affirmative duty to inquire, the defendant must first assert his dissatisfaction with his current counsel. <u>See, e.g.</u>, <u>Buhl v. Cooksey</u>, 233 F.3d 783, 792 (3d Cir. 2000) (explaining that "a defendant's request of self-representation in a criminal trial must be made clearly and unequivocally" to "prevent defendants from making casual and ineffective requests").

Here, Dixon did not indicate that he was dissatisfied or concerned with Mr. Peruto's representation at the plea hearing or at sentencing. To the contrary, during the change of plea hearing, the following exchange occurred:

> THE COURT:  Do you have an attorney today?
>
> THE DEFENDANT:  Yes, I do.
>
> THE COURT:  And what is his name?
>
> THE DEFENDANT:  His name is Charles Peruto.
>
> THE COURT:  Have you discussed your case with Mr. Peruto?
>
> THE DEFENDANT:  Yes, I have.
>
> THE COURT:  Are you satisfied with his representation so far?
>
> THE DEFENDANT:  Yes, I am.

Change of Plea Hr'g Tr. 4:25-5:9.

Where Dixon did not express or indicate any sort of dissatisfaction with Mr. Peruto's representation, the Court had

14

no reason to inquire further. Therefore, Dixon's additional argument that the Court failed to ask whether he was satisfied with Mr. Peruto's representation is of no avail.

Since Dixon has failed to show that Mr. Peruto's personal issues had any prejudicial effect on his defense, Dixon cannot succeed on this ground for relief.

B.   Presentence Report Meeting

Dixon next claims ineffective assistance of counsel based on Mr. Peruto's failure to personally appear during the presentence report meeting. Def.'s Mem. ¶ 16. According to Dixon, Mr. Peruto initially stated "that he would be late" but "ultimately never showed during this critical stage of criminal proceeding." Id.

The Government states, without more, that Dixon "points to no prejudice which resulted from counsel's absence at the interview for the presentence report, nor can he, because there was none." Gov't's Resp. 11.

As previously stated, a defendant's conclusory allegation that counsel was ineffective cannot provide a basis for relief in absence of a showing that the alleged ineffectiveness "actually had an adverse effect on the defense." Strickland, 466 U.S. at 693. Even though Dixon points to no specific prejudice suffered as a result of Mr. Peruto's absence

15

from the hearing, the Court's inquiry does not end there. Dixon claims Mr. Peruto's absence was during a "critical stage of [the] criminal proceedings." Def.'s Mem. ¶ 16.

In United States v. Cronic, 466 U.S. 648 (1984), which was decided the same day as Strickland, the Supreme Court held that under certain circumstances, the ineffectiveness of counsel "is properly presumed without inquiry into actual performance." Id. at 661. Such a presumption of prejudice is appropriate where the accused is denied counsel at a critical stage of the trial. Id. at 659-60; see also Bell v. Cone, 535 U.S. 685, 695-96 (2002) (explaining that "[a] trial would be presumptively unfair . . . where the accused is denied the presence of counsel at 'a critical stage'"--that is, "a step of a criminal proceeding, such as arraignment, that held significant consequences for the accused"). The Third Circuit has narrowly construed Cronic to "prescribe[] a presumption of prejudice only with regard to those critical stages of litigation where a denial of counsel would necessarily undermine the reliability of the entire criminal proceeding." Ditch v. Grace, 479 F.3d 249, 255 (3d Cir. 2007).

Here, Dixon cannot benefit from the narrow Cronic presumption. The presentence report meeting is not a critical stage of the trial "due to the probation officer's neutral role and the sentencing judge's independent discretion." United

16

States v. Travaglini, No. 90-0100, 1992 WL 220997, at *3 (E.D. Pa. Aug. 31, 1992) (citing United States v. Jackson, 886 F.2d 838, 844 (7th Cir. 1989)). As the Third Circuit has explained, "no court has found the Sixth Amendment right to counsel applies to routine presentence interviews." United States v. Tyler, 281 F.3d 84, 96 (3d Cir. 2002) (collecting circuit court cases); see also United States v. King, 559 F.3d 810, 813-14 (8th Cir. 2009) (explaining that there is no constitutional right to counsel during a presentence interview). Therefore, because Dixon failed to point to any specific prejudice suffered as a result of Mr. Peruto's absence from the hearing and no presumption of prejudice attaches, Dixon's claim cannot succeed on these grounds.

   C.   Review of Presentence Report

        Dixon also states that Mr. Peruto "failed to meet and review all versions of the [Presentence Investigation Report] with [Dixon]." Mot. at 9 (emphasis in original). Specifically, Dixon alleges that Mr. Peruto failed to "review and consult" with him "in respect to the second and third versions" of the presentence investigation report ("PSI"). Def.'s Mem. 5 ¶ 17. However, this claim lacks merit.

        Under Federal Rule of Criminal Procedure 32(e), the probation office must give the presentence report to the

17

defendant, the defendant's attorney, and an attorney for the government at least thirty-five days before sentencing unless the defendant waives this minimum period. Fed. R. Crim. P. 32(e)(2). The rule is intended "to ensure that the defendant and [his] counsel have had the opportunity to read the PSI prior to sentencing." United States v. Mays, 798 F.2d 78, 79 (3d Cir. 1986).

At sentencing, Mr. Peruto informed the Court that he had reviewed the report with Dixon and that he wished to argue two objections. Sentencing Hr'g Tr. 4:20-25. When given the opportunity to speak on his own behalf, Dixon did not object to counsel's statement that he reviewed the report with Dixon. In fact, in his affidavit submitted in support of his § 2255 motion, Dixon states that "the final revision was reviewed approximately twenty-four (24) hours prior to [his] sentencing." Def.'s Aff. ¶ 12, ECF No. 65. Therefore, Dixon's claim is meritless.

Additionally, Dixon fails to show that he suffered any prejudice as a result of Mr. Peruto's failure to review each version of the PSI with him. Therefore, because Dixon's claim is without merit and he does not show any prejudice suffered as a result of Mr. Peruto's alleged failure to review every version of the report, Dixon's claim cannot succeed.

D.    <u>Safety Valve Reduction</u>

Dixon next alleges ineffective assistance of counsel because Mr. Peruto indicated that Dixon would receive a downward reduction in his sentence by way of safety valve relief. Def.'s Mem. ¶¶ 9, 12. Dixon argues that because he relied on Mr. Peruto's assurances regarding the safety valve reduction, his guilty plea was not voluntary or knowing. <u>Id.</u>

The Government counters that the Court "thoroughly reviewed the terms of the plea agreement with [Dixon]--making clear that there was no mention of Safety Valve relief as a condition of the plea agreement." Gov't's Resp. 13. Thus, the Government argues that Dixon is not entitled to relief. <u>Id.</u> at 14-15.

A defendant's Sixth Amendment right to counsel "extends to the plea-bargaining process." <u>Lafler v. Cooper</u>, 132 S. Ct. 1376, 1384 (2012). Counsel is required to give a defendant sufficient information "to make a reasonably informed decision whether to accept a plea offer." <u>Shotts v. Wetzel</u>, 724 F.3d 364, 376 (3d Cir. 2013) (quoting <u>United States v. Day</u>, 969 F.2d 39, 43 (3d Cir. 1992)). Potential sentencing exposure is "an important factor in the decisionmaking process." <u>United States v. Bui</u>, 795 F.3d 363, 367 (3d Cir. 2015). To provide effective assistance at this stage, "counsel is required 'to know the Guidelines and relevant Circuit precedent.'" <u>Id.</u>

19

(quoting United States v. Smack, 347 F.3d 533, 538 (3d Cir. 2003)).

Yet the bar for ineffectiveness is high and a defendant must show that counsel provided information "that proves to be grossly erroneous and . . . that he would not have plead[ed] guilty in the absence of the erroneous information." Meyers v. Gillis, 142 F.3d 664, 666 (3d Cir. 1998). And generally, "where an adequate plea hearing was conducted," counsel's erroneous sentencing prediction does not constitute ineffective assistance. United States v. Shedrick, 493 F.3d 292, 299 (3d Cir. 2007); United States v. Mustafa, 238 F.3d 485, 492 (3d Cir. 2001) ("[A]ny alleged misrepresentations . . . were dispelled when [defendant] was informed in open court that there were no guarantees as to his sentence, and that the court could sentence him to the maximum.").

The safety valve provision states that in the case of an offense under 21 U.S.C. §§ 841 and 846, the court shall impose a sentence in accordance with applicable guidelines below the statutory minimum sentence, if the court finds that the defendant meets the criteria in 18 U.S.C. § 3553(f)(1)-(5). U.S.S.G. § 5C1.2; United States v. Kellum, 356 F.3d 285, 289 (3d Cir. 2004) (explaining that 18 U.S.C. § 3553(f) "allows a sentence 'without regard to any statutory minimum sentence' if the 'safety valve' factors are established"). This provision was

enacted "to provide relief to individuals playing minor roles in drug trafficking conspiracies, who lacked the detailed knowledge to qualify for 'substantial assistance' sentence reductions under 19 U.S.C. § 3553(e)." United States v. Holguin, 263 F. App'x 219, 220 (3d Cir. 2008) (nonprecedential).

In United States v. Bui, the defendant alleged that his counsel's erroneous advice concerning the applicability of the safety valve provision constituted ineffective assistance, which rendered his guilty plea involuntary or unknowing. 795 F.3d 363, 367 (3d Cir. 2015). The defendant argued that "both before and after the guilty plea, his counsel told other family members that [the defendant] was eligible for a reduced sentence pursuant to the 'safety valve.'" Id. at 365. However, the safety valve reduction was never available to the defendant because he had pled guilty to manufacturing and distributing marijuana within 1,000 feet of a school under 21 U.S.C. § 860--a conviction to which the safety valve exception does not apply. Id. at 365, 367 (referencing United States v. McQuilkin, 78 F.3d 105 (3d Cir. 1996)). In fact, the defendant's counsel later withdrew his § 3553 motion at the sentencing hearing in acknowledgement of Third Circuit precedent barring application of the safety valve exception to § 860. Id. at 365.

The Third Circuit determined that "the record clearly indicates [the defendant's] counsel provided him with incorrect

advice regarding the availability of a sentencing reduction, pursuant to § 3553(f)." Id. at 367. The defendant's statements averring counsel's representations to him, coupled with the fact that counsel filed a motion pursuant to § 3553(f), indicated the advice was indeed given. Id. The Third Circuit explained that "[c]ounsel's lack of familiarity with an eighteen-year-old precedent and his erroneous advice based on that lack of familiarity demonstrate counsel's performance fell below prevailing professional norms."[5] Id.

       Here, there is evidence that Mr. Peruto told Dixon he was eligible for the safety valve reduction, when in fact he was not. In his affidavit, Dixon avers that Mr. Peruto "consulted with [Dixon] indicating that [Dixon] would be eligible for the safety valve." Def.'s Aff. ¶ 6. Moreover, Mr. Peruto pursued the safety valve reductions at sentencing, which may further indicate that Mr. Peruto and Dixon had indeed discussed the issue. Mr. Peruto stated that "the defendant comes in for safety valve relief," Sentencing Hr'g Tr. 11:2-3, based on Dixon's actions "in the spirit of cooperation," id. at 10:25. Mr. Peruto further argued during the hearing that "the government is not

---

[5]     After issuing Bui, the Third Circuit vacated and remanded the Court's decision in United States v. Pham, 587 F. App'x 6 (3d Cir. 2014), for the same reasons stated in the Bui decision. United States v. Pham, 610 F. App'x 139 (3d Cir. 2015).

agreeing to a safety valve relief because they don't believe him." Id. at 11:11-12. Accordingly, viewing the facts in the light most favorable to Dixon, Mr. Peruto provided this advice, as Dixon alleges.

Assuming Mr. Peruto told Dixon that safety valve relief was available, there is a reasonable argument that Mr. Peruto knew or should have known that Dixon did not satisfy the well-known requirements for safety valve relief. The fifth requirement for operation of the safety valve under § 3553(f) is that "not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." 18 U.S.C. § 3553(f)(5). Where the defendant has not truthfully provided to the Government all information and evidence concerning the matter, he is not eligible to safety valve relief. See United States v. Ibeh, 480 F. App'x 658, 659 (3d Cir. 2012) (nonprecedential) (explaining that a defendant cannot be afforded a safety valve reduction where "[t]he inconsistencies in [the defendant's] statements to the government are patent and the information is less than complete"); United States v. Espinosa-Cruz, 244 F. App'x 421, 424 (3d Cir. 2007) (nonprecedential) (affirming the district court's determination that the defendant failed to qualify for

application of the safety valve provision where his "vague responses to th[e] [government's] questions strain[ed] credulity").

Here, it seems that Mr. Peruto knew that Dixon had not been entirely truthful with the Government during the safety valve debriefings. During the change of plea hearing, Mr. Peruto explained that when Dixon "first started to cooperate . . . [he] puffed or exaggerated his ability to cooperate so he would stay out of custody and he made certain statements that were untrue." Change of Plea Hr'g Tr. 28:6-10. Also, during the sentencing hearing, Mr. Peruto acknowledged discrepancies in Dixon's statements to the Government, but argued that despite these discrepancies, the Government's refusal to entertain safety valve relief violated "the spirit of cooperating." Sentencing Hr'g Tr. 12:14. Indeed, during the sentencing hearing, the Government called Nehemiah Haigler, a narcotics agent with the Pennsylvania Office of Attorney General for narcotics investigation and drug control, who stated that Dixon inconsistently reported the weight of marijuana he had sold. Id. at 45:16-47:15.

As the Court summarized during sentencing, despite Dixon's untruthful statements to the Government, Mr. Peruto's argument was "that there is a custom and practice, not written down anywhere, . . . that a defendant who cooperates and then

24

for whatever reason ceases to cooperate is not given credit, but

he is at least protected against use of his initial cooperation

that would not be used against him at least at the sentencing

level." Id. at 16:22-17:4. The Court then ruled as follows:

> That the defendant ultimately stopped
> cooperating, as he had a right to do, for
> whatever reason, does not mean that either
> Mr. Peruto did not give him the right advice
> [to cooperate], or that there is some custom
> or practice that would insulate or cloak the
> defendant from the consequences of having
> admitted to relevant conduct during the
> course of inchoate cooperation.
>
> So, I think something as significant as
> been asserted to be the custom and practice,
> I don't see the record reflecting the
> presence of such a custom and practice in
> the district.
>
> Concerning the safety valve, the
> defendant had originally testified as to his
> involvement in the drug trade and at the
> debriefing on August 21st, 2013 he testified
> to distributing, or . . . during the course
> of the interview, he spoke of distributing
> far less marijuana in prior years than he
> had testified or stated at his initial
> interview on May 1st of 2012.
>
> Given the circumstances that have been
> described here in Court, it appears that the
> original testimony at the May 1st, 2012 was
> and is the correct testimony. Upon
> reflection and for whatever reason, the
> defendant decided to testify to far less
> marijuana at a later interview.
>
> Th[u]s we find that is inconsistent
> with the requirement under the safety valve
> that the defendant provide truthful
> representations of his involvement in the
> offense.

25

> Additionally, the effort to try to
> transfer titled properties to his wife for
> one dollar, the Court finds is an effort to
> protect those properties from forfeiture
> and, therefore, inconsistent with a desire
> to cooperate in this case.
>
> So, for all of those reasons, again,
> the objections will be overruled.

Id. at 67:12-68:10.

Nevertheless, unlike in Bui, in which long-standing precedent indicated that the safety valve adjustments were not available for § 860 convictions, there is no stark legal barrier to the application of the safety valve adjustments to Dixon's § 841 convictions. See Ruiz-Herrera, 503 F. App'x at 138 n.2 (explaining that the safety valve provision may be applied to a defendant's § 841 conviction). Viewed in this light, the advice that Mr. Peruto provided Dixon did not fall "below prevailing professional norms." Bui, 795 F.3d at 367.

In any event, even if Dixon could show that Mr. Peruto's advice regarding safety valve relief constituted representation below a reasonable standard, the Court's plea allocution and the Government's conveyance of the agreement's terms advised Dixon of the "actual sentencing possibilities." McCoy v. United States, 96 F. Supp. 2d 469, 479 (E.D. Pa. 2000). The Third Circuit has "long held that an erroneous sentencing prediction by counsel is not effective assistance of counsel

where, as here, an adequate plea hearing was conducted."
Shedrick, 493 F.3d at 299 (collecting cases). As explained in
Bui, in the "majority of guilty plea cases, the [d]istrict
[c]ourt's plea colloquy . . . serve[s] to remedy counsel's
error." Bui, 795 F.3d at 367.

Here, the record indicates that Dixon understood that
even after entering a guilty plea, there would be no guarantee
as to the Court's sentence. The following exchange occurred
during the plea colloquy:

> THE COURT:  Do you understand that the Court
> will not be able to determine how the
> advisory sentencing guidelines would be
> applied in your case until a presentence
> report is completed and you and the
> government had an opportunity to challenge
> the facts reported by the probation office?
>
> THE DEFENDANT:  Yes, I do.
>
> THE COURT:  Do you understand that the Court
> could, in appropriate circumstances, and in
> light of the factors stated in 18, United
> States Code, Section 3553, impose a sentence
> which is more severe or less severe than the
> sentence that the advisory guidelines
> recommend?
>
> THE DEFENDANT:  Yes, I understand.

Change of Plea Hr'g Tr. 42:19-43:7.

Since Dixon's argument is contrary to his sworn
statement that he understood that the guideline sentence could
not be determined until after a presentence investigation report
was prepared, the Court will deny Dixon's claim. See Stinson v.

<u>United States</u>, Nos. 07,0170, 11-6230, 2012 WL 2478476, at *4
(E.D. Pa. June 29, 2012).

Further, and most detrimental to his claim, Dixon
cannot satisfy <u>Strickland</u>'s prejudice prong. Dixon has not
indicated that he would have proceeded to trial but for Mr.
Peruto's alleged assurances regarding the safety valve
reduction. There is no indication that Dixon was reluctant to
plead guilty. <u>Cf.</u> <u>United States v. Nahodil</u>, 36 F.3d 323, 327 (3d
Cir. 1994) (explaining that given the defendant's "oft repeated
protestations of innocence and his considerable reluctance to
plead guilty," the court could "not rule out that there was a
reasonable probability that but for his counsel's allegedly
constitutionally deficient advice he would have proceeded to
trial"). Moreover, even without a safety valve reduction, Dixon
would have benefited from his plea agreement. <u>Cf.</u> <u>Bui</u>, 795 F.3d
at 368 (explaining that defendant satisfied prejudice prong of
Strickland standard because "[i]f [the defendant] were unable to
benefit from safety valve reduction, he would have gained no
benefit from his plea agreement"). As the Government points out,
"the evidence against Dixon was overwhelming" and he "received a
significant benefit from the plea agreement which was a
considerably lower sentencing guideline range." Gov't's Resp.

15. Because Dixon is unable to demonstrate prejudice,[6] the Court will reject Dixon's claim on these grounds.[7]

    E.   <u>Revised Plea Agreement</u>

      Next, Dixon claims ineffective assistance based on Mr. Peruto's alleged statement that a revised plea agreement with modified language would be offered. Def.'s Mem. ¶¶ 8, 10. Dixon states that he never received or signed a revised plea agreement as promised. <u>Id.</u> at 4 ¶ 10. Because he allegedly relied upon Mr. Peruto's promise that a revised plea agreement was forthcoming, Dixon argues that his plea was involuntary. <u>Id.</u> at 4 ¶ 12.

      In response, the Government states that "[t]he only revision discussed was the one to the factual summary--not the plea agreement--which was made at the defendant's request and in

---

[6]    Additionally, Dixon is unable to "demonstrate prejudice because the District Court would not necessarily have exercised its discretion to downward depart" where the "application of the 'safety valve' merely permits a sentence to be imposed below the mandatory minimum." <u>United States v. Moronta-Matos</u>, 53 F. App'x 620, 622 n.1 (3d Cir. 2002) (nonprecedential).

[7]    Because Dixon's ineffective assistance claim as to the safety valve provision cannot succeed, neither can his claim that he entered the plea agreement unknowingly and involuntarily due to the ineffective assistance. <u>See</u> <u>Nahodil</u>, 36 F.3d at 326 (explaining that the same two-prong <u>Strickland</u> standard must be met "[t]o show that ineffective assistance of counsel made [the defendant's] guilty plea involuntary").

his favor." Gov't's Resp. 14. Therefore, the Government argues that Dixon's claim on these grounds should be dismissed.

Here, the Government and Mr. Peruto revised the factual summary during a recess at the change of plea hearing. Change of Plea Hr'g Tr. 38:10-21. The Government specifically agreed to submit a revised guilty plea memorandum reflecting the changes to the factual portion. Id. at 40:9-12.

Thereafter, the Court engaged Dixon as follows:

THE COURT: Okay. That will be fine. Now, Mr. Dixon, you heard the Assistant United States Attorney summarize the facts of the case against you, is that right?

THE DEFENDANT: Yes, I did.

THE COURT: And you also heard the Assistant United States Attorney withdraw from her recitation of the facts one word and two full statements, did you hear that?

THE DEFENDANT: Yes, I did.

THE COURT: Okay. With the understanding that she has withdrawn what has been marked as one, two and three, we take that out, with the understanding taking that out do you agree that otherwise the Assistant United States Attorney has correctly and accurately summarized the facts of the case against you?

THE DEFENDANT: Yes, I can agree.

THE COURT: I'm sorry?

THE DEFENDANT: Yes, I can agree with that.

Id. at 40:13-41:7. Following the hearing, a revised plea document was entered, which reflected the factual changes to which Dixon expressly agreed. ECF No. 28.

Even if Dixon misunderstood that an entirely new agreement was forthcoming instead of the revised memorandum, the Court and counsel for both sides clarified that only the factual summary, not the terms of the plea itself, was the basis for the objection and subsequent modification. The Court emphasized the finality of the plea agreement during the colloquy, and Dixon stated under oath that he understood the terms of his plea agreement, as well as the rights he was waiving. Moreover, the Government recited the terms of the only plea agreement in the case. During the change of plea hearing, the Court asked Dixon: "Do you have any agreement with the government other than the plea agreement which is of record in this case?" Change of Plea Hr'g Tr. 44:4-6. Dixon answered: "No, I do not." Id. at 44:7. Therefore, Dixon's claim cannot succeed on this basis.

F.    Relevant Conduct Issues

Dixon next claims ineffective assistance because Mr. Peruto allegedly stated that Dixon's relevant conduct issues would be decided after the change of plea hearing and that relevant conduct would "preclude additional charges." Def.'s Mem. 4 ¶¶ 11, 12. Dixon alleges that he "expressed his concerns

about the 'relevant conduct' during the plea agreement" and signed the agreement upon the belief that his "relevant conduct would not be used against him." Def.'s Mot. 5-6. Dixon thus contends that his guilty plea was not voluntary or knowing because, in signing the agreement, he relied on Mr. Peruto's assurance that relevant conduct would be decided at a later date. Def.'s Mem. 4 ¶ 12.

The Government counters that during the change of plea hearing, there was no "mention of an agreement as to relevant conduct as part of the plea agreement, and in fact, that issue was specifically addressed by both parties and the Court as being a contested sentencing issue." Gov't's Resp. 13.

Here, Mr. Peruto's statement that relevant conduct would be considered at sentencing was not erroneous. During the change of plea hearing, Mr. Peruto objected to the weight of the marijuana described in the Government's factual summary. Change of Plea Hr'g Tr. 26:20-30:3. The Government explained that "[w]hat he is contesting[, which] will be a sentencing issue[,] is whether the defendant should be responsible for relevant conduct for prior conduct that is not charged." Id. at 30:4-7. The Government went on to state that "Mr. Peruto and I have had many discussions about this and we have agreed that will be a sentencing issue." Id. at 30:8-10. Therefore, because the alleged statement that relevant conduct would be considered at

sentencing was correct, Mr. Peruto's performance was not deficient and cannot provide a basis for an ineffective assistance claim.

To the extent Dixon takes issue with Mr. Peruto's alleged statement that his relevant conduct would "preclude additional charges," this argument is likewise without merit. "All that is constitutionally required is for counsel to provide accurate advice to the defendant regarding his potential sentencing exposure under the relevant statutes and advisory guidelines range and to explain that any prediction that is provided is indeed an estimate." United States v. Isabella, Nos. 13-175, 15-76, 2015 WL 6134082, at *9 (W.D. Pa. Oct. 16, 2015) (citing Bui, 795 F.3d at 367); see also United States v. Hardy, Nos. 09-0151, 13-0355, 2013 WL 3830507, at *10 (W.D. Pa. July 23, 2013) ("[C]ounsel's representation is not constitutionally deficient if he advises his client of an estimated advisory guidelines range that is later incorrect if Defendant understands it was an estimate and is correctly advised of the potential statutory penalties for the offense."). Therefore, Dixon's claim on this ground will be dismissed.

G.    Advice Not to File a Direct Appeal

Finally, Dixon claims Mr. Peruto provided ineffective assistance by advising Dixon "not to file a direct appeal."[8] Def.'s Mot. 11. Dixon does not allege that Mr. Peruto failed to file a requested appeal; rather, he takes issue with Mr. Peruto's advice that any appeal would be meritless.

Where there is no evidence that the client requested an appeal, it cannot be said that counsel was ineffective for advising against an appeal when it would be meritless.[9] "Waivers of appeals, if entered into knowingly and voluntarily, are valid, unless they work a miscarriage of justice." United States v. Khattak, 273 F.3d 557, 563 (3d Cir. 2001). Dixon has not indicated that there was a valid, nonfrivolous basis for appeal that was permitted under his plea agreement. As analyzed above, there has been no valid basis for an ineffective assistance

---

[8]    Although Dixon's pro se memorandum of law in support of his motion does not separately address this ground, the Court will nevertheless address it to afford Dixon "full consideration of all of the grounds for relief that he has asserted pursuant to § 2255." See United States v. Kale, Nos. 09-264, 12-6669, 2013 WL 2475564, at *2 n.1 (E.D. Pa. June 7, 2013).

[9]    For example, in Roe v. Flores-Ortega, 528 U.S. 470 (2000), the Supreme Court held "that counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing." Id. 480 (emphasis added).

claim raised by Dixon. Therefore, Dixon's final ground for relief cannot succeed.

## V.    CERTIFICATE OF APPEALABILITY

When a court issues a final order denying a § 2255 motion, it must also decide whether to issue a certificate of appealability. Such a certificate "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Pabon v. Mahanoy, 654 F.3d 385, 393 (3d Cir. 2011) (quoting Miller-El v. Cockrell, 537 U.S. 322, 327 (2003)).

Here, Dixon has not made such a showing, as each of the grounds he raised can be readily resolved without an evidentiary hearing. The Court will therefore decline to issue a certificate of appealability.

## VI.   CONCLUSION

For the reasons discussed above, the Court will deny Dixon's motion without an evidentiary hearing and decline to issue a certificate of appealability. An appropriate order follows.

35